LAW OFFICES OF GARROTTO & GARROTTO
Greg W. Garrotto, State Bar #89542
1925 Century Park East, Suite 2000
Los Angeles, California 90067
Telephone (310) 229-9200
Fax (310)229-9209
jjggarrotto@msn.com

Attorneys for Plaintiff
Keanu Ethan Campos, a minor

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEANU ETHAN CAMPOS, a minor, by and through his Guardian ad Litem, Deniz Gonzalez<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF KERN, a public entity; Deputy Sheriff Jason Ayala, a public employee; Deputy Joshua Bathe, a public employee; and , DOES1-10, Inclusive | Case No.: 1:14-cv-01099-DAD-JLT<br><br>OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, ETC.; MEMORANDUM OF POINTS AND AUTHORITIES<br><br>Date: March 15, 2016<br>Time: 9:30 a.m.<br>Court: Robert E. Coyle, United States Courthouse, 2500 Tulare St., Fresno, CA 93721<br>Judge: Hon. Dale A. Drozd, Judge |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Plaintiff, Keanu Ethan Campos, a minor, by and through his Guardian ad Litem, Deniz Gonzalez and presents the following Memorandum of Points and Authorities in opposition to Defendants' Motion for Summary Judgment and or

OPP TO MSJ; MEMORANDUM OF POINTS AND AUTHORITIES

Adjudication of Issues as follows:

**FACTUAL INTRODUCTION**

This is a civil rights and wrongful death action filed by the son of Luis Campos, who died in the Kern County Central Receiving Jail Facility, operated by the Kern County Sheriff Department.

Luis Campos was a 35 year old Hispanic male, who, on August 10, 2013, was found hanging in his cell in the Central Receiving Facility ('CRF') of the Kern County Jail by an electric cord taken from a large floor fan that was just outside the decedent's cell and well within reach of Mr. Campos. (Plaintiff's Statement of Further Disputed Facts ('PSFDF') No. 1, 2, 3) At the time of his death, Mr. Campos was an actively suicidal inmate in a Suicide Cell on the B-Deck of the facility; the Cell being designated as Cell B4-1. He had exhibited suicidal behavior on an almost continuous basis since his arrest and detention in said facility on August 8, 2013. (PSFDF Nos. 9, 10, 12)

During the course of the Sheriff's Department investigation, the fan was described as a "large fan" with black electrical cord attached to the back of the fan. After the death, the end with the electrical plug was found not to be attached to the fan and the cord that remained was 27" long. The end was frayed with wires exposed. The frayed end had gray duct tape wrapped around it. The vertical pole of the fan was measured and determined to be 35" away from the cell bar walls of

B4-1, the cell where Campos was housed at the time of his death. The closest portion of the cell B4-1 to the fan was approximately 18 inches. (PSFDF Nos. 2-3)

A black electrical cord was found hung over the metal bars of the south wall of cell B4-1, which appeared to be from the fan located outside the cell. The thickness of the cord appeared to be consistent with the ligature marks on Campos neck. It was this cord that Mr. Campos hanged himself with. (PSFDF No. 4-5)

Cell B4-1, the Suicide Watch Cell where Plaintiff was housed, was divided into two parts, in contrast to the other two Suicide Watch Cells, each of which consisted of a open room on B-Deck. There was a partition wall running the width of the cell, which obscured view of the area where the bed and the toilet were located. It was this area where Mr. Campos was found dead. From the vantage point of the security desk, where the two deputies manning the B Deck spent the major portion of their shift, this area could not be seen. Furthermore, the other two Suicide Watch Cells on B Deck were continuously monitored by loop cameras with monitors in the area where deck control officers were stationed. (PSFDF Nos. 6, 19, 20)

The large floor fan had always been in the same position where it was at the time of Mr. Campos death for as long as the Defendants Deputy Sheriff Jason Ayala and Deputy Sheriff Joshua Bathe had worked there. The fan was used

because it would get very hot and the air conditioning was not always working in the Central Receiving Facility.  The purpose of the fan was to point it at the deputies' desk and cool the deputies, rather than the inmates of the jail.  The cord had always had the duct tape around it.  The large floor fan, at the time of Mr. Campos death, would have been about 12-15 feet from the desk and in full view of the deputies.  (PSFDF No. 7-8)

Mr. Campos had been actively suicidal and self destructive since he had been arrested on August 8, 2013. It was known to custody staff that he had apparently intentionally injured himself twice by hitting himself on cell bars and had to be placed in the safety cell, which is in the basement.  In fact one of the deputies on the shift immediately preceding the one where Mr. Campos took his own life indicated that they had been told that they should be extra cautious about him in light of the fact that he was actively harming himself  (PSFDF No. 9) During the detention where he committed suicide, Mr. Campos was taken to Kern County Medical Center for a medical evaluation for a head laceration which was self-inflicted.  On that occasion, the Sheriffs Department did not have a mental evaluation of Mr. Campos performed.  (PSFDF Nos. 9-10) The only mental health screening during this detention was one performed by a licensed vocational nurse, whose license did not allow him or her to perform mental health screens according to the California Vocational Nurses Practice Act of the California Business and

Professions Code. (PSFDF Nos. 13-14)

According to Kern County Sheriffs Department Procedures, Mr. Campos was to be evaluated by Mental Health Staff at the facility when he was removed from the safety cell. This did not occur on either of the two occasions when Mr. Campos during the incarceration of August 8-10, 2013. (PSFDF Nos. 11, 13)

Prior to August 8, 2013, the date that Mr. Campos was incarcerated, it was known to Kern County Sheriffs Department that he became actively suicidal when he was incarcerated. During his previous detentions, even though he was actively suicidal, he was never seen by Mental Health Personnel in the jails; a practice violating established policies and procedures. (PSFDF No. 15)

The policies and procedures of the Kern County Sheriffs Department require that custody personnel conduct a cell search of the new housing location and remove any contraband or unapproved suicide housing items. There is no evidence that cell B4-1 was ever searched prior to Mr. Campos being housed there, or replaced there after being placed in the safety cell. (PSFDF Nos. 17, 21)

Mr. Campos suicide was the very predictable result of his known and documented behavior, during this detention as well as previous ones, of becoming self destructive every time he was incarcerated by Kern County Sheriffs Department. Kern County Sheriffs Department exhibited deliberate indifference to his known self destructive conduct, and provided no protection to him in their

ratification and tolerance of the fact that policies and procedures were not followed by Sheriff's Department personnel, either in his prior incarcerations or in August, 2013, which lead to deadly results.  The apparent systemic failure by staff in following procedure not only related to having a Mental Health Evaluation but to an inspection of housing to protect Mr. Campos from obtaining 'tools' by which he could effectuate his self destructive wishes.

The policies and procedures ratified by Kern County can be further seen in the housing that Mr. Campos was subject to.  Of the three Suicide Cells two, Cells B4-2 and B4-3 were one room with no partition walls.  They were continuously monitored by loop cameras by use of television monitors in the Control Booth; evidencing the fact that Kern County Sheriff Department realized the value of continuous monitoring in suicide prevention.  This is in contrast to Mr. Campos' cell, B4-1 where there was no monitoring and half of which was obscured from the security desk by a partition wall, which was exactly where Mr. Campos killed himself.

Finally, the wrongful conduct of the individual deputies, which Plaintiff believes rises to the level of deliberate indifference, but at the very least evidences negligence, in allowing a floor fan with a cord which was previously severed, to be within 18 inches of the cell bars; essentially invited Mr. Campos to kill himself.

The Defendants' Motion for Summary Judgment and or Adjudication of

Issues should be denied in full; there are genuine issues of disputed fact which should be decided by the trier of fact which precludes the granting of this motion.

**STATUTORY BASIS FOR DEFENDANTS' MOTION**

A party seeking summary judgment has the burden to identify those portions of the record that indicate the absence of a genuine issue of material fact.  Once the moving party has made this showing, the nonmoving party must designate by affidavits, depositions, answers to interrogatories or admissions on file, specific facts showing that there is a genuine issue for trial.  Arpin v Santa Clara Valley Transportation Agency (9th Cir. 2001) 261 F3d 912.

A fact issue that requires a trial is genuine when the evidence is such that a "reasonable jury could return a verdict for the non-moving party".  But the Court will not find a "genuine issue" where the only evidence presented is uncorroborated and self-serving testimony.  Villiarimo v Aloha Island Air, Inc. (9th Cir. 2002) 281 F3d 1054.

Insofar that the Defendants' Motion directly involves the question of 'qualified immunity', the Supreme Court has made it clear that qualified immunity presents a legal question demanding prompt judicial attention, not only by a lone district court judge, but also by a three judge appellate panel and perhaps even the Supreme Court of the United States.  The Court in Hunter v Bryant (1991) 502 US

224, for example, observed that immunity ordinarily should be decided long before trial rather than be placed in the hands of the jury.  Likewise in Saucier v Katz (2001) 533 US 194, the Court concluded that not only was the defendant entitled to immunity, but the "suit should have been dismissed at an early stage of the proceedings".

The question of qualified immunity is a legal question, Appellate Courts engage in de novo review of qualified immunity determinations. Bisbee v Bey (10th Cir. 1994) 39 F3d 1096, 1099-1100; Yvonne L. v New Mexico Department of Human Services (10th Cir. 1992) 959 F.2d 883, 891.

**AS A PRETRIAL DETAINEE, THE FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE APPLIES TO PROTECT AGAINST A FAILURE TO ADDRESS SERIOUS MEDICAL NEEDS**

The Courts have long analyzed claims that correctional facility officials violated pretrial detainee's constitutional rights by failing to address their medical needs, including suicide prevention, under a "deliberate indifference" standard. Clouthier v County of Contra Costa (2010 9th Cir.) 591 F.3d 1232 at 1243-1244. A prison official cannot be liable for deliberate indifference unless he or she knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists and he must also draw that inference. Farmer v Brennan (1994) 511 U.S. 825. The Plaintiff must show that the official was subjectively aware of the serious medical need and failed adequately to respond. Conn v City of Reno (2010 9th Cir.) 591 F.3d 1081. A heightened suicide risk can present a serious medical needs. Conn, supra, 591 F.3d at 1095. There is no question that Mr. Campos had a serious medical need as he exhibited suicidal behavior throughout his incarceration from August 8 to August 10, 2013. The question becomes twofold; 1)did the individual defendants know of that serious medical need, that he was a heightened suicide risk, but disregarded that risk; and 2) did the Defendant Kern County, in its custom and practices in ignoring established policy which was specifically designed to prevent suicides caused by a lack of training or otherwise knowingly and placing him in a dangerous environment which allowed him to harm himself, evidence deliberate indifference of Mr. Campos serious medical need.

It is uncontradicted that custodial and medical staff at the Central Receiving Facility knew that Mr. Campos was actively suicidal since he had been incarcerated. Deputy Sean Collier had been told, we can infer from superiors that there was a need to be "extra cautious" with Mr. Campos because of his past history of overtly suicidal and self destructive behavior. Yet, to a man did any of the four deputies involved in shift change, Collier, Saldana, Ayala or Bathe recall

any conversation about Mr. Campos and the fact that he was suicidal and have hours before been released from the safety cell.  Neither did any of the deputies inspect the cell at any time to determine whether there were any safety hazards.  If they had used common sense, they would have determined that an implement 'perfect' for suicide was within easy reach of Mr. Campos, an electrical cord that had been already severed and repaired.

Finally, and most importantly, the critical actions taken by Mr. Campos in effectuating his own death occurred in full view, 12-15 feet away from the desk where custodial staff primarily remained during the course of their shift.  This involved reaching for the electric cord, unwrapping the duct tape that covered the pre-existing repair, unraveling the wires, and removing over 2 feet of cord.  From their failure to observe these acts one can conclude that all four deputies and the Defendants Ayala and Bathe were deliberately indifferent to Mr. Campos serious medical needs.  Further deliberate indifference can be found in the fact that the fan was put in a position most propitious to the custody personnel, directly pointed at them, to cool them during hot summer days when the air conditioning was broken; a position that provided an open opportunity for a suicidal inmate to gain the instrumentalities of death.

In order to proceed to trial as to the individual defendants, there must be evidence raising a genuine issue of disputed fact that Deputies Ayala and Bathe

knew that Mr. Campos was in a substantial danger of killing himself but deliberately ignored that risk.  Clouthier v County of Contra Costa (2010 9th Cir.) 591 F.3d 1232 at 1248.   They knew that Mr. Campos was actively suicidal and had been so since his incarceration.  They were advised that they needed to be "extra cautious" about Mr. Campos in light of his past history.  And finally, they knew that the fan, with a fractured cord, lay within easy reach of a suicidal inmate.

The Defendant County of Kern is liable under Monell v Department of Social Services of the City of New York (1978) 436 U.S. 658.  Monell liability is applicable on two counts; 1) there was a longstanding practice or custom which constitutes a 'standard operating procedure' of the local governmental entity Jett v Dallas Independent School District (1989) 491 U.S. 701; and, there was a lack of training on the part of the County of Kern insofar as the manner in which to protect a suicidal inmate.  City of Canton v Harris (1989) 489 U.S. 378.

Firstly, a longstanding practice or custom can be found in the configuration of Cell B4-1.  Even though it was directly adjacent to the area where the security desk and security personnel were located, there was a partition wall that obscured one half of the cell; it was this partition wall that allowed Mr. Campos to commit suicide.  Kern County was very aware that there was a need for constant monitoring of a suicidal inmate; this is demonstrated by the fact that the other two suicide watch cells had loop cameras allowing constant observation.  This need

was totally ignored in Cell B4-1.

It can also be found in the placement of the fan. The fan had been in the location, to use a euphemism, for "as long as anyone can remember". It had, an apparently poorly repaired cord for that same period. It presented an obvious danger and invitation to a mentally unstable inmate to kill himself. An experienced custodial law enforcement officer must have known that it would constitute a dangerous condition. The argument that it had never previously raised an issue does not mean that County of Kern should have not recognized something that was in fact created by its agents and employees; the fan, its placement and its repair.

The Kern County Sheriffs Department promulgated a series of Policies and Procedures for the purpose of prevention of suicide. A suicidal inmate was to be evaluated by Mental Health Staff at the facility when he was removed from the safety cell. (PSFDF No. 11) When custody personnel placed a suicidal inmate in a new housing location, the custody staff were to conduct a search of the cell. (PSDFD No. 17)

A study of Mr. Campos medical records from the Kern County Sheriffs Department evidences a systemic failure of staff to follow policies and procedures designed to protect suicidal inmates. Each and every time Mr. Campos came into the custody of the Sheriffs Department, he became suicidal. PSFDF No. 15,

Declaration of Greg W. Garrotto Re: Evidence, Exhibit 10, Medical Records.  At no time was he evaluated by mental health professionals.  It is true that he was evaluated on one occasion, by a licensed vocational nurse whose license does not allow him or her to conduct mental or psychological or psychiatric evaluations.  It also notable that when Mr. Campos was suicidal and injured himself, rather than being sent to Kern County Medical Center for evaluation of the root cause, mental instability, County of Kern personnel sent him to be evaluated for a result, a laceration.  That action flies in the face of logic; Kern County Medical Center had its hands tied by virtue of the fact that it could only evaluate the exact complaint that the Sheriffs Department had set forth, and could not evaluate why the inmate was exhibiting suicidal behavior.  (Garrotto Dec., Ex. 10, Medical Records, P. 67.)

All of these practices and procedures by the County of Kern are legal bases for Monell liability.  In the first instance, Monell liability lies when action pursuant to official municipal policy of some nature caused a constitutional tort.  Monell, 436 U.S. 658, 691.  Board of County Commissioners of Bryan County, Oklahoma v Brown (1997) 520 U.S. 397, 403.  The liability of the local governing body may attach when an employee committed a constitutional violation pursuant to a "longstanding practice or custom."   Webb v Sloan (2003 9th Cir.) 330 F.3d 1158.  The question of whether a policy or custom exists is a jury question; the custom or practice must be so persistent that it constitutes a permanent and well

settled municipal policy.

Monell liability can also be found in the lack of training policies. From the evidence adduced in this case, there was a systemic failure to follow procedures meant to protect suicidal detainees. Over the period of time that Mr. Campos was incarcerated, in August, 2013 and before, there was an abject failure to have him evaluated by a mental health professional when he was actively suicidal, even though policies required jail personnel to take that action. From this evidence, one can reasonably infer that the County of Kern's training policies were not adequate to train its employees to handle the usual and recurring situations with which they must deal and that the County was deliberately indifferent to the obvious consequences in its failure to train said staff. <u>Merritt v County of Los Angeles</u> (1989 9th Cir.) 875 <u>F.2d</u> 765, 769-770; <u>Redman v County of San Diego</u> (1991 9th Cir.) 942 <u>F.2d</u> 1435.

The evidence in this case adduces the fact that the County operated a suicide watch cell with multiple hazards in its configuration, with a fan in close proximity that presented the tools for committing suicide and allowed a desperate and suicidal inmate to obscure himself so that he could engage in self destruction. The County also apparently actively ignored or failed to train its officers and employees to follow policies and procedures designed to prevent suicides. The evidence in the County of Kern Medical Records (Garrotto, Dec. Exhibit 10)

prove beyond a preponderance that Monell liability lies in this case.

## THERE IS NO QUALIFIED IMMUNITY FOR ANY OF THE DEFENDANTS IN THIS CASE

Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at time of the challenged conduct. Reichle v Howards (2012) 566 U.S. ___. To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law. Ashcroft v Kidd (2011) 563 U.S. ___.

In Taylor v Barkes (2015) 575 U.S. ___, the Supreme Court's latest decision in the area of jail suicides and constitutional violations states:

> "Nor would Colburn II (Colburn v Upper Darby Township (1991) 946 F.2d 1017, 1023) have put petitioners on notice of any possible constitutional violation. Colburn II reiterated that officials who know of an inmate's particular vulnerability to suicide must not be recklessly indifferent to that vulnerability."

This pronouncement is a logic result of Farmer v Brennan (1994) 511 U.S. 825 which held that Eighth Amendment liability requires actual awareness of risk.

As of August, 2013, this right was clearly established.

In the case of Mr. Campos, there is not a theoretical or a potential risk. It is clear from the evidence that Mr. Campos had a particular vulnerability to suicide and the defendants were actually aware of that risk. By their actions a reasonable law enforcement officer and department would have known that they were violating that constitutional right. The defendants are not protected by qualified immunity in this case.

**THE COURT SHOULD DENY THE MOTION OF DEFENDANTS INSOFAR AS IT IS DIRECTED TO PLAINTIFF'S CLAIM UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 377.60, WRONGFUL DEATH**

The Plaintiff agrees that a cause of action under California State law for wrongful death is statutory (California Code of Civil Procedure Section 377.60). The Plaintiff also agrees that Mr. Campos has two other children, who have not been located. But Plaintiff disagrees with Defendants that either Helling v Lew (1972) 28 Cal. App.3d 434 or Cross v Pacific Gas and Electric (1964) 60 Cal.2d. mandate that there be only one action where all heirs are joined, and absent that, the case be dismissed.

In stating that a wrongful death action is joint, it is meant that all heirs should be joined or be joined in the action and that a single verdict should be

rendered for all recoverable damages; when it is said that the action is single, it is meant that only one action for wrongful death may be brought whether, in fact, it is instituted by all or only one of the heirs, or by decedent's personal representative as statutory trustee for the heirs; when it is said that the action is indivisible, it is meant that there cannot be series of suits by heirs against the tortfeasor for their individual damages. Cross v Pacific Gas and Electric, 60 Cal.2d 690 at 694. The precise issue in Cross was whether the statute of limitations for wrongful death was suspended during the plaintiff's minority. The Court simply stated the rule that there is only one indivisible claim for wrongful death, not that the claim should be abated or dismissed if not all heirs are joined.

Likewise, in Helling v Lew (1972) 28 Cal. App.3d 434 involved a factual scenario involving the death in an auto accident. The heirs brought an action against the healthcare providers for wrongful death and settled it. They then filed an action against the driver of the other vehicle involved in the accident. The defendants in the second action moved to dismiss the action because of the resolution of the first action. The Court of Appeal held that there was no prohibition against proceeding in the second action but that the amount of the settlement in the first action would have to be introduced into evidence as a potential setoff. This case does not stand for the proposition that if all heirs are not joined, a wrongful death action cannot proceed. Rather, it seems to implicate

that omitted heirs are precluded from bringing subsequent and individual actions. 28 Cal.App.3d 434. And in a footnote (No. 2), it indicates that if a plaintiff knows of other heirs and fails to join them, that heir is liable for the resulting damage, citing Watkins v Nutting (1941) 17 Cal.2d 490. California law is not supportive of Defendants' argument.

Neither do either of the two cases cited by Defendant, Cotta v County of Kings (E.D. Cal. 2015) 79 F.Supp.3d 1148 or Estate of Hatfield v County of Lake (N.D. Cal. 5/29/12), support the proposition that this matter cannot proceed. At most, a case cited by the court in Estate of Hatfield, Ruttenberg v Ruttenberg (1997) 53 Cal.4th 801, states that if a wrongful death case goes forward without a proper heir, the filing heir proceeds at their peril since the omitted heir may have an action against the filing heir for a portion of the settlement.

Finally Government Code Section 844.6(a)(2) provides that **a public entity** is not liable for an injury to any prisoner. It does not exonerate the individual defendants from personal liability to the extent authorized by the Government Claims Act. A public employee is liable for his or her torts to the same extent as a private person. Government Code Section 820(a); Lugtu v California Highway Patrol (2001) 26 Cal.App.4th 703. Therefore Defendants Ayala and Bathe are liable for their negligence.

Furthermore, both the public entity and the employee are liable for a failure

to summon medical care when they are on notice that the prisoner is in need of immediate medical care and the employee fails to take reasonable action to summon such medical care. Government Code Section 845.6   Whether the governmental entity had actual or constructive knowledge of an immediate need for medical care and whether the action of the governmental entity to provide such care was reasonable are generally questions of fact. Zeilman v County of Kern (1985) 168 Cal.App.3d 1174.

In reviewing the facts set forth in Plaintiff's Statement of Further Disputed Facts, while Plaintiff believes that they evidence a constitutional violation, i.e. deliberate indifference; but they also evidence negligence by all defendants and a knowledge by all defendants of a serious medical need.

**CONCLUSION**

The death of Luis Campos was clearly preventable.  They knew that he was suicidal by history, conduct, and his statements.  He had a serious medical need. Yet by the deliberate indifference of the defendants to that serious medical need, he was able to take the 'tools' that had been provided to him by the defendants by their actions and omissions, and killed himself.  The motion should be denied in its entirety.

Dated: 2/28/2016                                     GARROTTO & GARROTTO
                                                     /s/ Greg W. Garrotto
                                                     _____